In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1309

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONALD C. RIDLEY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:13-CR-30084-DRH-002 — **David R. Herndon**, *Judge.*

ARGUED DECEMBER 9, 2015 — DECIDED JUNE 13, 2016

Before EASTERBROOK and HAMILTON, *Circuit Judges*, and
PALLMEYER, *District Judge.*[*]

HAMILTON, *Circuit Judge*. A jury found appellant Donald
Ridley guilty on several felony charges for participating in a
bank robbery. On appeal he challenges his convictions on
three separate grounds: the sufficiency of the evidence that he

[*] The Honorable Rebecca R. Pallmeyer of the Northern District of Illinois, sitting by designation.

brandished a firearm during the robbery; admission of an FBI agent's lay testimony regarding cell phone tracking information; and the district court's supplemental instruction to jurors when they said they were at an impasse. We affirm.

I.   *The Bank Robbery*

On the morning of May 7, 2008, two men staged an armed robbery of the Farmers & Merchants Bank in Hoyleton, Illinois. The robbers entered the bank dressed all in black, wearing ski masks, and carrying guns. One robber held employees and customers at gunpoint while the other went to the bank's vault and took about $115,000 in cash.

A key witness to the robbery was Cathy Michelle Livesay, who had arrived at the bank on May 7 for just her third day of work as a teller. She testified that each robber carried a black handgun resembling a 9-millimeter pistol. Livesay also caught a glimpse of the getaway vehicle, a "bluish purple Ford." Once the robbers had driven off, she called her husband and told him of the robbery, the getaway car, and the direction the suspects were headed. Her husband was able to place himself along the getaway route and saw a Ford Ranger matching the description his wife had given him and driving at high speed. He noted the license plate number as the suspects sped past. He lost track of the Ranger as it drove on Route 127 headed in the direction of Liberty School Road.

Earlier that day, at 3:30 a.m., a Liberty School Road resident named Dennis Windler had awoken and looked out his bedroom window. To his surprise, he noticed a truck and a car driving slowly in tandem down Liberty School Road. He testified that the truck was a blue pick-up and that the car was a light color and damaged along its side. He returned to bed.

Later that morning, he was tending to his farming and saw that the same truck he had seen earlier was now parked in a nearby field. He investigated with his neighbor, Dennis Witte, and discovered the truck was empty and had no license plates.

An hour or two later, Windler returned to discover the truck was gone but the same car—which Windler described as painted white—was now parked in the same location. Along with Witte, Windler noted the license plate number of the car and returned home. A short time after that, Windler returned to find the blue truck back in the field, and he heard police sirens in the distance heading for Hoyleton. He also saw the damaged white car from earlier, but this time it was occupied. Windler tried to stop the car, but it sped past him. He then inspected the truck. The doors were flung open and the interior was covered in pink dye. Windler immediately understood what had happened: "*Uh-oh. Bank robbery.*" A dye pack in the stolen cash had exploded in the truck. Windler and Witte called the police.

The FBI quickly learned the truck had been stolen from a dealer in Belleville, Illinois, near the home of Donald Ridley's grandmother. The white car's license plate was registered to Ridley. DNA evidence gathered from the truck matched Ridley. Officers located and spoke to Ridley, who denied involvement and claimed he had spent the day with his cousin Terry Smith. When officers talked with Smith about his story, he admitted that Ridley had asked him to cover for him. Smith also revealed that he had spent the evening of May 6 with Ridley and an acquaintance named Joe Johnson.

Faced with mounting evidence, Johnson turned on Ridley and admitted that they were the Hoyleton robbers. He revealed details of the scheme: on the morning of the robbery, he and Ridley each brought gloves, a change of clothes, and something to obscure their faces. They planned vehicle swaps consistent with Livesay's and Windler's observations. Johnson also said that during the robbery, he held customers and employees at gunpoint while Ridley entered the bank vault to steal the money.

Just before the fifth anniversary of the robbery, a federal grand jury indicted Ridley for armed bank robbery and related charges. The case proceeded to trial, and the jury found Ridley guilty of armed bank robbery, brandishing a firearm in relation to a crime of violence, making false statements to a federal law enforcement officer, and obstruction of justice. Ridley was sentenced to 246 months in prison and five years of supervised release and was ordered to pay $115,000 in restitution.

II. *Evidence of Brandishing*

On appeal, Ridley contends first that the evidence was not sufficient to convict him for brandishing a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see also *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010) (in reviewing sufficiency challenge, "we view all evidence and draw all reasonable inferences in the light most favorable to the prosecution").

The jury heard conflicting testimony about whether Ridley carried and displayed a firearm during the bank robbery. As noted, teller Livesay testified that both robbers carried firearms where she could see them. A bank customer, Kimberly Connelly, described the robbers and also testified that each carried a firearm, one of which appeared to be a heavy, black pistol. Ridley's partner Johnson, however, testified that Ridley had not possessed or brandished a firearm during the robbery.

Ridley argues that Johnson's "unequivocal" testimony that Ridley did not have a firearm undermines the conviction for possession and brandishing. Because the government did not challenge Johnson's truthfulness as a witness and used some of his statements to its advantage, Ridley argues, the government implicitly endorsed all of Johnson's testimony and is stuck with his assertion that Ridley did not carry a gun. Ridley contends that the conflicting testimony as to whether he carried and brandished a firearm must therefore be resolved entirely in Johnson's and thus Ridley's favor.

We disagree. The government is not necessarily stuck, as a matter of law, with every detail of a cooperating witness's testimony. Under the general standard of *Jackson v. Virginia*, the jury could reasonably decide to credit Livesay's and Connelly's testimony that both robbers carried and displayed firearms. Their testimony on that point is legally sufficient to convict Ridley on the brandishing charge. Where plausible (i.e., not impossible) witness testimony conflicts, it is the jury's role to resolve those conflicts. E.g., *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003), citing *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998). The jury had sufficient grounds to credit the testimony of the teller and customer over the word

of Ridley's partner in crime and to find that Ridley actually possessed and brandished a firearm during the robbery.

III. *Cell Phone Location Testimony*

Ridley also argues that he is entitled to a new trial because the district judge allowed a non-expert FBI agent to testify about a map showing the locations of Ridley's and Johnson's cell phones the day before and day of the robbery. The defense did not object to the testimony at trial, however. We find no plain error.

As part of the investigation, the FBI obtained the cell phone records for Ridley and Johnson. The records showed that Ridley's phone was in southern Illinois near Hoyleton in the early hours of May 7. Johnson's phone records showed a similar pattern. Ridley and Johnson had also called each other several times on May 6 and 7.

Special Agent Dolan, who has special technical training in interpreting the raw data provided in the cell records, used those records to create a map that showed call locations. The finished map was intended to be, as FBI Special Agent Nicholas Manns put it colorfully, "agent-proof," that is, clear enough that technical expertise would not be required to explain or understand it. The government presented the evidence not through Dolan but through Manns.

Manns testified that "the records provide what we call cell site data, which … when we use the phone it touches towers and the towers transfer, etc., so we're able to tell from those towers where the phone" was located. Manns added that the "FBI has specialized agents that are very good at analyzing these phone records," but also noted that the records were "pretty self-explanatory." Manns also said he was "not real

tech savvy" but that the map was easy to understand. The map was then admitted into evidence without objection. Manns explained the map and various cell locations on May 6 and 7 placing Ridley's cell phone in the vicinity of the robbery. Again, the defense did not object.

When a party makes a timely objection to admitting evidence, we review the decision for abuse of discretion, giving considerable deference to the trial judge on the spot. E.g., *United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008). But because Ridley did not object to this testimony by Agent Manns, we review only for plain error. *United States v. Christian*, 673 F.3d 702, 707–08 (7th Cir. 2012) (also involving Agent Manns, coincidentally). This means Ridley must demonstrate an obvious and prejudicial error that caused a "miscarriage of justice, in the sense of seriously affecting the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 708, quoting *United States v. Orr*, 622 F.3d 864, 868 (7th Cir. 2010); see generally *United States v. Olano*, 507 U.S. 725, 736 (1993); *United States v. Atkinson*, 297 U.S. 157, 160 (1936).

In challenging this testimony by Agent Manns, the defense had two principal strategies available at trial. First, it could raise no objection but then challenge Manns' credibility and expertise on cross-examination and in closing argument. That's what happened. Ridley's lawyer questioned Manns as to inferences he was drawing from the cell phone location data, trying to inject doubt into his testimony. That strategy did not work, and we assume that Manns' testimony contributed to the jury's guilty verdicts.

With the benefit of hindsight, Ridley now wants a chance to try the second strategy that was available at trial: try to ex-

clude the testimony by Agent Manns by challenging his qual-
ifications. It's not hard to understand, though, why a trial at-
torney would not make this objection. If it had been sustained,
the government could have fixed the problem easily by call-
ing Agent Dolan, who prepared the map and had more tech-
nical expertise. The defense then would have had to try to
challenge a better qualified witness. By allowing the defense
to pursue its own strategy on this point, rather than interven-
ing to bar some of Agent Manns' testimony, the district court
did not commit a plain error.

We have addressed similar problems in cases raising Con-
frontation Clause issues for the first time on appeal. For ex-
ample, in *United States v. Moon*, 512 F.3d 359 (7th Cir. 2008), a
defendant raised a *Crawford* challenge to a government wit-
ness's testimony relaying a colleague's findings. See *Crawford
v. Washington*, 541 U.S. 36 (2004). We found no plain error, ex-
plaining that a proper objection against this witness's testi-
mony would have left the defendant worse off because the
government then could easily have produced the better qual-
ified colleague who could speak directly to technical aspects
of the trial with greater authority. *Moon*, 512 F.3d at 361. And
when the defense chooses not to seek the readily available fix
for the arguable evidentiary problem, enabling the defense to
cross-examine the less credible witness, we are especially re-
luctant to find plain error when that strategy does not pay off.
See *United States v. Maxwell*, 724 F.3d 724, 728 (7th Cir. 2013)
(determining that there was no plain error if "it may be to de-
fendants' advantage to accept the hearsay version of evidence
… . The lack of a demand for testimony by an available de-
clarant leads to the conclusion that the appellate argument is
strategic rather than sincere."), quoting *Moon*, 512 F.3d at 361.
See also *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 328

(2009) ("It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis."). Allowing Agent Manns' testimony was not a plain error.[1]

IV. *Jury Instruction*

After four days of evidence, the jury began deliberations. The jury instructions included the standard instruction from *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc), about seeking a unanimous verdict. After deliberating just a few hours, the jury sent a note to the court: "Judge Herndon, The jury is stuck on a verdict and cannot come to a unanimous agreement. What should the jury do? Do we wait until a unanimous agreement is reached? Or is there another option for the jury?" Ridley's lawyer asked for a mistrial, which the court denied.

The judge proposed instead that the following note be sent to the jury: "The Court requests that the jury continue in their deliberations in an effort to reach a unanimous verdict." Neither side objected, and the judge sent the note to the jury. Later that day, the jury returned with its guilty verdicts.

Ridley argues on appeal that the judge erred by responding to the jury's note about an impasse by failing to give a full

---

[1] Ridley also argues on appeal that Agent Dolan's map of cell phone locations was inadmissible hearsay. He did not raise this objection at trial, and in fact, his counsel affirmatively stated "No objection" to the map's admission. This intentional choice not to object amounted to waiver. *United States v. Cooper*, 243 F.3d 411, 415–16 (7th Cir. 2001). If we considered the possibility of a plain error, our reasoning would track our analysis of Agent Manns' testimony.

*Silvern* instruction. *Silvern* was a response to decades of de-
bates in the wake of *Allen v. United States*, 164 U.S. 492 (1896),
in which the Supreme Court upheld a supplemental jury in-
struction that "encouraged the jurors to reconsider their indi-
vidual positions" in the face of a deadlocked jury. *United States
v. Collins*, 223 F.3d 502, 508–09 (7th Cir. 2000) (summarizing
development of *Silvern*).

Recognizing the risk that an *Allen* instruction could un-
duly pressure some jurors to go along with a majority merely
for the sake of unanimity, we adopted in *Silvern* a standard
script for judges to offer juries. *Id.* The script was meant pri-
marily as a safe harbor to help minimize appeals of instruc-
tions to divided juries "in the interest of judicial economy and
uniformity." *Silvern*, 484 F.2d at 882–83. But the script was not
only a safe harbor. We warned in *Silvern*: "If in any jury trial
tried after thirty (30) days from this opinion a supplemental
instruction relating to a deadlock is given other than in the
above form, a resulting conviction will be reversed and re-
manded for a new trial." *Id*. at 883. Ridley argues that in re-
sponse to the jury's note, the district court was permitted only
to repeat the *Silvern* language without deviation.[2]

---

[2] The full text of the *Silvern* instruction reads:

> The verdict must represent the considered judgment of each
> juror. In order to return a verdict, it is necessary that each ju-
> ror agree thereto. Your verdict must be unanimous.

> It is your duty, as jurors, to consult with one another and to
> deliberate with a view to reaching an agreement, if you can
> do so without violence to individual judgment. Each of you
> must decide the case for yourself, but do so only after an im-
> partial consideration of the evidence with your fellow jurors.

*Silvern* itself, however, did not address issues of waiver or plain error. Because Ridley did not object at trial, we review the judge's response to the jury note only for plain error. Fed. R. Crim. P. 52(b); *United States v. Rodriguez*, 67 F.3d 1312, 1320 (7th Cir. 1995) (reviewing instructions deviating from *Silvern* for plain error where no objection was made); *United States v. Allen*, 797 F.2d 1395, 1400 (7th Cir. 1986) (same). To show a plain error, as noted above, Ridley must demonstrate that "(1) there was error, (2) it was plain rather than subject to reasonable dispute, (3) it affected his substantial rights, and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Seals*, 813 F.3d 1038, 1045 (7th Cir. 2016).

We find no plain error. Despite the strong language in *Silvern* itself, quoted above, we have rejected the hard-and-fast approach to *Silvern* that Ridley advocates. E.g., *Collins*, 223

> In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

484 F.2d at 883. This court's pattern jury instructions for both criminal and civil cases have made stylistic changes to this formula. See Pattern Criminal Jury Instructions of the Seventh Circuit 7.03 (2012); Federal Civil Jury Instructions of the Seventh Circuit 1.34 (2015), which are both available at www.ca7.uscourts.gov.

F.3d at 509 ("Any deviation from *Silvern* is not necessarily reversible error."); *Rodriguez*, 67 F.3d at 1319–20 ("[W]e have not required trial courts to replicate the approved [*Silvern*] language with no deviation."). At least when a defendant does not object to the phrasing of a supplemental jury instruction, our inquiry "is not whether the trial court recited the approved language with perfect accuracy, but rather whether the judge's departure from the approved language changed the balance struck by the approved language in such a way as to be more coercive of unanimity." *Id.* at 1320.[3]

Our primary concern in such cases is whether the court's instructions "pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Crotteau*, 218 F.3d 826, 835 (7th Cir. 2000), quoting *United States v. Kramer*, 955 F.2d 479, 489 (7th Cir. 1992). The judge's response to the jury note did not do that. It merely requested that the jury continue to deliberate. The response did not require continued deliberations and did no more than encourage the jury to reach a unanimous verdict, as the full *Silvern* instruction had done a few hours earlier as part of the complete set of jury instructions.

In *United States v. Degraffenried*, 339 F.3d 576 (7th Cir. 2003), we confronted a nearly identical response to a jury note. The

---

[3] We reject Ridley's assertion that his lawyer did object to the jury instructions. His lawyer moved for a mistrial on the ground that the jury seemed deadlocked. Not surprisingly, the judge denied that motion, coming as it did so early in deliberations. The judge then consulted both counsel as to the wording of the instruction. Ridley's lawyer made a wording suggestion that the judge adopted. The defense made no further objection, though the judge asked for suggestions a second time, and neither side asked the court to give further *Silvern* instructions.

judge had given the full *Silvern* instruction before deliberations began, and the jury sent a note indicating it was deadlocked. The judge sent the jury a note reading: "Members of the jury, I've read your note. Please continue deliberations." We held this to be non-coercive, neutral, and "entirely proper." *Id.* at 579–81.

The judge's response here was similarly neutral, like other instructions we have found acceptable. For instance, a judge may request that a jury continue to deliberate without providing the full *Silvern* instruction. See, e.g., *United States v. Smith*, 818 F.3d 299, 301 (7th Cir. 2016) (note to jury saying "each of you is part of the jury that has been picked to decide this case. Each of you must continue to deliberate."); *Kramer*, 955 F.2d at 489 (note to jury said only "Continue your deliberations."); *United States v. D'Antonio*, 801 F.2d 979, 983–84 (7th Cir. 1986) (note to jury saying "Please continue your deliberations. I shall call you into the courtroom at 4:30 p.m."). This is not the rare case where the instruction is coercive in context. See *United States v. Blitch*, 622 F.3d 658, 669–71 (7th Cir. 2010) (remanding for new trial where, after poll revealed jury was one vote short of unanimity, district judge instructed jury to continue deliberating toward unanimous verdict even though jury had previously been told they could leave early that day).

There is no doubt that a defendant has a constitutional right to an impartial, uncoerced jury. *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988); *Schaff v. Snyder*, 190 F.3d 513, 535 (7th Cir. 1999). But as we explained in *United States v. Sblendorio*, our *Silvern* instruction is a supervisory rule with no "constitutional overtones." 830 F.2d 1382, 1388 (7th Cir. 1987) (noting that *Silvern* instructions are within the constitutional bounds set by the stronger *Allen* instructions). The model instruction

was designed "in the interest of the effective administration of justice," as a method of eliminating excess litigation by defendants challenging jury instructions. *Id.* The *Silvern* model was not intended as an indispensable safeguard of constitutional rights, and there is no "right" to receive a *Silvern* instruction, especially when the defense does not ask for it. *Id.*; see also *Chavez v. Martinez*, 538 U.S. 760, 772 (2003) ("violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person").

In addition, to show plain error, a defendant must show that the error was prejudicial, resulting in a miscarriage of justice. See *United States v. Williams*, 552 F.3d 592, 593–94 (7th Cir. 2009). The judge's neutral response to the jury in this case was not prejudicial for the reasons explained above. The district court did not commit plain error by requesting, in language approved by counsel for both sides, that the jury continue deliberations.

The judgment of the district court is AFFIRMED.